**GENERAL CARE CORP., d/b/a HCA Park West Medical Centers, Plaintiff,**

v.

**MID–SOUTH FOUNDATION FOR MEDICAL CARE, INC., et al., Defendants.**

**No. 89–2172–GA.**

United States District Court, W.D. Tennessee, W.D.

April 4, 1991.

**406**

Margaret C. Mazzone, Margaret L. Behm, Dodson, Parker, Shipley, Behm & Seaborg, Nashville, Tenn., Clare N. Orman, Martin, Tate, Morrow & Marston, Memphis, Tenn., for General Care Corp.

R. Mark Glover, Charles M. Key, Memphis, Tenn., for Mid–South Foundation for Medical Care, Inc.

W. Hickman Ewing, U.S. Atty. by Robert Williams, Asst. U.S. Atty., Memphis, Tenn., Lisa A. Olson, Elizabeth Pugh, Attys., Dept. of Justice, Civ. Div., Washington, D.C., for Louis Sullivan.

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING SECRETARY'S MOTION FOR SUMMARY JUDGMENT

GIBBONS, District Judge.

Before the court are the cross-motions for summary judgment filed by plaintiff General Care Corporation and defendant Secretary of the United States Department of Health and Human Services. Plaintiff General Care Corporation, d/b/a HCA Park West Medical Centers (hospital or General Care), alleges in this action for declaratory and injunctive relief that the proposed disclosure of certain information relating to the plaintiff hospital by defendant Mid–South Foundation for Medical Care, Inc., a Medicare Peer Review Organization (PRO or Mid–South), violates 42 U.S.C. § 1320c–9 and 42 C.F.R. Part 476. Plaintiff seeks a declaration that the applicable law and regulations do not require disclosure and a permanent injunction preventing defendant Mid–South from making such disclosure. Defendant Secretary argues that the applicable law and regulations require such disclosure by Mid–South. Mid–South takes no position on the merits of the controversy, but merely awaits the court's ruling as to whether disclosure is required.

The factual background is as follows. In December, 1986, Mid–South received a request to investigate the quality of medical care rendered to a patient by the plaintiff hospital. Mid–South investigated the case and notified the hospital that it had identified a problem with the quality of care provided to the patient, who died at the hospital in January 1986. In response, the hospital submitted a corrective action plan for use in future situations. The plan was subsequently accepted by Mid–South, which then provided follow-up monitoring of the situation.

The patient's daughter was dissatisfied with the responses she received from Mid–South when she inquired about the PRO investigation. In the final written response to her inquiries, the PRO described its investigation and findings and stated that corrective action would be taken by the hospital. Still not satisfied, in 1988 the daughter had the legal representative of the estate of the deceased request further disclosure from Mid–South. Specifically, he requested

(1) the medical records used in the investigation;

(2) a copy of defendant Mid–South's initial notice to the plaintiff hospital of its concerns with some of the hospital's procedures, and the letter requesting a corrective action plan;

(3) a copy of the hospital's response to defendant Mid–South and a corrective action plan; and

(4) a copy of defendant Mid–South's acceptance of the hospital's corrective action plan and followup monitoring plans.

Exhibits 8–11, *In Camera* Declaration of Patricia A. Booth. The hospital objected to the disclosure of items 2–4 and instituted this suit, arguing that the regulations do not permit such disclosure. The court granted a temporary restraining order prohibiting disclosure on March 1, 1989, that remains in effect by stipulation until resolution of the case on the merits.

The Secretary has interpreted the regulations to require disclosure of the type of information about a hospital which is at issue here. He argues that all hospital-specific information has been deliberately excluded from the definition of confidential information, thereby rendering it nonconfidential.

Plaintiff argues that the information sought to be disclosed is regarded as "confidential" and nondisclosable under the applicable regulations, *see* 42 C.F.R. § 476.-101, since it is not expressly listed as nonconfidential information at 42 C.F.R. § 476.120. Also, plaintiff asserts that the Secretary's internal interpretation is not entitled to deference.

The parties agree that there are no genuine issues as to any material fact, and that disposition of the case on cross-motions for summary judgment is appropriate. The issues in this case are essentially ones of statutory construction and legislative history, which are questions of law properly resolved by summary judgment. *See Oklahoma ex rel. Dep't of Human Servs. v. Weinberger,* 741 F.2d 290, 291 (10th Cir. 1983); *Dubuque v. Yeutter,* 728 F.Supp. 303, 308 (D.Vt.1989).

To determine whether the applicable statute and regulations require the proposed disclosure, the court must decide whether the information at issue is confidential or nonconfidential within the meaning of the statute and regulations. A resolution of this issue requires a review of the relevant statutes and regulations.

The Peer Review Improvement Act of 1982 generally prohibits the disclosure of information acquired by a PRO in carrying out its functions under a contract with the Department of Health and Human Services. Congress delegated to the Secretary, however, the authority to create exceptions to the general rule of confidentiality and nondisclosure:

(a) ... Any data or information acquired by any such organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to any person except—

....

(2) in such cases and under such circumstances as the Secretary shall by regulations provide to assure adequate protection of the rights and interests of patients, health care practitioners, or providers of health care....

42 U.S.C. § 1320c–9. In addition to 42 U.S.C. § 1320c–9, the further statutory basis for the promulgation by the Secretary of regulations which permit disclosure of information is found at § 476.103, which provides in pertinent part:

(b) Section 1160 of the [Social Security] Act provides that PRO information must be held in confidence and not be disclosed except where—

(2) Specifically permitted or required under this subpart [of the regulations].

42 C.F.R. § 476.103.

Disclosure is thus prohibited, absent a specific provision in the regulations requiring or permitting disclosure. The limited circumstances in which disclosure is permitted are found at 42 C.F.R. Part 476, § 476.120, entitled "Disclosure of Nonconfidential Information." While the regulations do not specifically define "nonconfidential information," they do list nine types

of material that constitute nonconfidential information and are subject to disclosure.

The regulations regarding the acquisition, protection, and disclosure of confidential information define "confidential information" as the following:

(1) Information that explicitly or implicitly *identifies an individual patient, practitioner or reviewer.*

(2) Sanction reports and recommendations.

(3) Quality review studies which identify patients, practitioners or institutions.

(4) PRO *deliberations.*

42 C.F.R. § 476.101(b) (emphasis added). The regulations do not expressly address the type of information at issue in this case.

The Secretary first argues that information which identifies hospitals was deliberately excluded from the definition of confidential information found at 42 C.F.R. § 476.101(b)(1), thereby rendering it nonconfidential and disclosable. The Secretary argues that confidential information was explicitly defined to include information which identifies "an individual patient, practitioner, or reviewer," but purposely omitted information which identifies hospitals from the list. In support of this position the Secretary cites 50 Fed.Reg. 15,350 (1985), where thirty-nine commenters on the proposed rule objected to the exclusion of hospital-specific information on the grounds that hospitals should be afforded the same protection as practitioners in terms of disclosure policies. The Secretary responded that

> Section 1160(a)(2) of the Act states that the Secretary shall provide by regulation for adequate protection of the interests of patients as well as for practitioners and providers. Public interest is served by providing access to certain PRO data by the public or by agencies that have public responsibilities to which PRO data are relevant. PROs deal with matters of great public concern—the provision and cost of health care.
>
> They are, therefore, an important source of information to aid consumers and consumer organizations in reaching in-

formed decisions about the types of health care services that are offered. Also, the policy of disclosure of provider-specific, but not practitioner specific information is supported by recommendations in the congressionally mandated Institute of Medicine October 1981 study entitled "Access to Medical Review Data: Disclosure Policy For Professional Standards Review Organizations".

50 Fed.Reg. 15,350 (1985).

The proposed rule and the current regulations clearly omit hospital-specific information from the list of information that is confidential. It is not clear, however, what is meant by hospital-specific information (or "provider-specific" information), or how broadly the Secretary intended the term to be applied. The Secretary argues that the exclusion is very broad and affects *all* hospital-specific information (i.e. any information which mentions a hospital by name, unless otherwise defined as confidential), including all the information at issue in this case. Federal Defendant's Memorandum in Support of Motion for Summary Judgment, p. 13. The Secretary urges the court to use great deference when reviewing the agency's internal interpretation of the regulation.

The plaintiff hospital argues that the exclusion of hospital-specific information from the list of confidential information was intended to be very narrow and was not intended to apply to information regarding a specific patient's complaint and subsequent investigation. Specifically, plaintiff relies on the regulatory history, maintaining that when the agency excluded hospital-specific information from the definition of "confidential information," it was referring only to general and aggregate statistical information which the statutory and regulatory history had previously contemplated, and eventually made disclosable in 42 C.F.R. § 476.120. Plaintiff argues that the regulatory history shows that disclosure of the type of information sought to be disclosed here was never considered by the agency; therefore, the Secretary's expansive interpretation of the regulation is unreasonable and must be struck.

In reviewing the competing constructions of the regulations offered by the parties, the court is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, the standard for judicial review of administrative action. Under this standard of review, the court must decide questions of law, interpret statutory provisions, and set aside only those agency findings that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ This court agrees with the Secretary that under the deferential standards of 5 U.S.C. § 706, the administrative agency's interpretation of its own regulation is entitled to substantial deference. *See Fluor Constructors v. Occupational S. & H. Rev. Comm'n*, 861 F.2d 936, 939 (6th Cir.1988) (citing *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). If, however, the agency's interpretation is inconsistent with the terms of the regulation, it is not entitled to considerable deference. *University of Cincinnati v. Bowen*, 875 F.2d 1207, 1209 (6th Cir.1989); *Vista Hill Foundation, Inc. v. Heckler*, 767 F.2d 556, 559 (9th Cir.1985) (internal interpretation of Secretary of Health and Human Services "must sensibly conform to the purpose and wording of the regulations."); *Abbott–Northwestern Hosp. Inc. v. Schweiker*, 698 F.2d 336, 340 (8th Cir. 1983) (issue is whether Secretary's interpretation is inconsistent with the terms or underlying policy of Medicare regulations).

Also, courts do not defer to an agency's interpretation of a regulation if it has not been consistently applied over time, *Sioux Valley Hosp. v. Bowen*, 792 F.2d 715, 719 (8th Cir.1986), or is not the result of thorough and reasoned consideration. *Id.; Tex. E. Prod. Pipeline v. Occupational S. & H. Rev. Comm'n*, 827 F.2d 46, 48 (7th Cir.1987) (adhering to the general rule that the Secretary's interpretation of the regulations is entitled to deference if the interpretation is reasonable); *Granville House, Inc. v. Health & Human Servs.*, 715 F.2d 1292, 1296–97 (8th Cir.1983).

■ The precise weight to be accorded an interpretation in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements. *General Motors Corp. v. Ruckelshaus*, 724 F.2d 979, 985 (D.C.Cir.1983) (citing *General Elec. v. Gilbert*, 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976)). The key "question for this court ... is not whose interpretation of the statute [the court] prefer[s], but whether [the court is] persuaded that the Secretary's interpretation is reasonable and consistent with the regulation's language." *Davis v. Secretary of Health & Human Servs.*, 867 F.2d 336, 339 (6th Cir.1989); *University of Cincinnati*, 875 F.2d at 1209, 1212 (citations omitted). Courts are the final authority on matters of statutory construction, and are not required to simply rubber-stamp their affirmance of administrative decisions that are inconsistent with or frustrate congressional policy. *Granville House, Inc. v. Health and Human Servs.*, 715 F.2d at 1296 (citation omitted).

■ Applying the standards set forth above, this court agrees with plaintiff's analysis of the regulatory history, and finds the Secretary's interpretation to be unreasonable and inconsistent with the underlying purpose and history of the regulatory scheme.

The regulatory history of the confidentiality provisions begins with the November 1976 proposed regulations for disclosure of information by PSROs, the predecessors to PROs.[1] In the introductory discussion to

---

1. In 1972, Congress established the Professional Standards Review Organization (PSRO) program. Part B, Title XI of the Social Security Act. The purpose of the PSRO program was to assure that health care services and items for which payment may be made under the Medicare and Medicaid programs were medically necessary, conformed to appropriate profession-al standards and were delivered in the most efficient and economical manner possible. In 1982, the Peer Review Improvement Act of 1982 amended Part B of Title XI of the Social Security Act to establish the Utilization and Quality Control Peer Review Organization (PRO) program. Title I, Subtitle C of the Tax Equity and Fiscal Responsibility Act of 1982; Pub.L. 97–

the proposed rules, the agency discussed two categories of information with which PSROs would deal. The first category involves information of a "sensitive or personal nature requiring stringent safeguards." The second category includes information that is public in nature prior to receipt by the PSROs and summary aggregate statistics.

The interim final rule was published on January 16, 1978. 43 Fed.Reg. 2282 (January 16, 1978). This rule set forth two categories of information which could be disclosed: information which had already been made public and summary statistics aggregated from the Uniform Hospital Discharge Data Set (the multi-purpose, basic data set containing information on a hospital discharge) (UHDDS). 42 Fed.Reg. 2284 (January 16, 1978). If the UHDDS statistical information identified a hospital, the hospital was to be given the opportunity to submit comments before the data was disclosed. *Id.*

In its comments on the interim final rules, the agency stated that disclosure of summary statistics which identify health care institutions was acceptable, because this data meets a variety of needs, including identification of problem areas, health planning and the funding of health services. *Id.* at 2282. There were no other provisions for the disclosure of information acquired by or generated by a PSRO in the course of evaluating a hospital patient care matter.

The agency issued another proposed rule on January 15, 1979, attempting "to deal, in a comprehensive manner, with all information acquired or generated by PSROs for review purposes...." 44 Fed.Reg. 3059 (January 15, 1979). The agency stated that

It is evident that much of the information acquired by PSROs, especially from medical records, is sensitive or personal, and should be treated as confidential information. Furthermore, to preserve the

integrity of the peer review process in which peers work together to improve health care services, it is critical that certain information be held in confidence. *Id.* Recognizing the competing interests involved, the agency further stated that

[D]isclosure of PSRO information for claims payment purposes, to assist others who can benefit from access to PSRO information and to ensure accountability of the PSROs is of equal importance. *Id.* The agency then discussed the scope of the proposed regulations as they dealt with disclosure:

[I]nformation has been categorized as confidential or nonconfidential. Nonconfidential information encompasses the criteria and procedures used by PSROs to conduct review, previously public information, certain administrative information, and statistical information, including statistics on the utilization and patient population of individual institutions and groups of practitioners.

*Id.* At this point in the promulgation of the regulations, the proposed rules had never discussed disclosure of hospital-specific information *per se*, or in the context of specific patient cases. The only hospital-specific information discussed in terms of nonconfidentiality was statistical information. The agency further discussed confidentiality of PSRO information:

We share the concern of health care institutions and practitioners that health records be carefully protected, but believe that PSROs, as organizations of health care professionals, can be trusted to protect them properly.... [W]e believe that to make information on individual practitioners generally available would severely inhibit the effectiveness of the peer review process an [sic] discourage participation in PSRO activities.

*Id.* at 3060-61.

When the PSRO program was replaced by the PRO program, the focus on confidentiality and the narrow provisions for

248. The 1982 legislation provided for PROs to assume PSRO responsibilities for the review of health care services funded under Medicare, and to determine whether those services are

medically necessary, are furnished at the appropriate level of care, and are of a quality that meets professionally recognized standards. 50 Fed.Reg. 15,347-48 (April 17, 1985).

disclosure were preserved in the statute and regulations. In fact, Congress expanded the confidentiality of PRO information by expressly providing that a PRO was not a federal agency for purposes of disclosure under the Freedom of Information Act. 42 U.S.C. § 1320c–9(a).

The Secretary used the January 1979 PSRO proposed rules as a starting point when promulgating new regulations to implement the 1982 PRO statute. 49 Fed. Reg. 14,977 *et seq.* (April 16, 1984). Like the January 1979 rules, the 1984 proposed rules recognized the importance of confidentiality to the PRO program, as well as the need to disclose certain information,[2] and classified PRO information as either confidential or nonconfidential. In its comments, the agency discussed nonconfidential information as follows:

> Nonconfidential information encompasses the criteria and procedures used by PROs to conduct review, previously public information, certain administrative information, and statistical information (including statistics on the utilization and patient population of individual institutions and groups of practitioners). We are aware of some objections to treating *statistical information on individual institutions as nonconfidential information.* However, the statute sets forth the recognitions that organizations such as health planning agencies and rate setting commissions are dependent on institutional information to carry out their responsibilities.

49 Fed.Reg. 14,979 (April 16, 1984) (emphasis added). Again, nothing in the proposed rule indicates that any hospital-specific information other than the statistical information described above would be considered nonconfidential information.

Furthermore, the agency's responses to the public comments received regarding the proposed rules reveal its position. Seventy-five commenters expressed concern over possible misuse and misinterpretation of the institution-specific information allowed to be disclosed in § 476.120(a)(7) (disclosure of nonconfidential aggregate statistical information) and § 476.141 (disclosure of PRO interpretations and generalizations on the quality of care that identify a particular institution). The agency agreed with and addressed the commenters' concerns, by making some changes to "afford a provider the protections needed to avoid possible misinterpretation where the PRO releases data concerning that provider." *Id.* at 15,350. It is significant that in explaining the changes, the agency provided examples in which the PRO could disclose data such as "mortality statistics" or "nosocomial infection rate data." *Id.*

These examples support the contention that the current regulations only contemplated limited disclosure of certain institution-identifying information that is of a statistical nature. Such a reading also conforms to the prior regulatory history's limited interpretation of nonconfidential institution-specific information as only that information of a statistical nature. The agency's response made no mention of disclosing as nonconfidential information specific investigative materials or information relating to a specific case.

Finally, the current regulations, as promulgated in April 1985, contain a list of "nonconfidential information" that is substantively identical to the list contained in the April 16, 1984 proposed rules, in which no hospital-specific information other than aggregate statistical information was designated as nonconfidential. *See* 42 C.F.R. § 476.120. This review of the regulatory history illustrates exactly what type of hospital-specific information was being considered when the agency excluded such information from the definition of confidential information contained in 42 C.F.R. § 476.101(b). Nothing in the history of the rules indicates information such as that sought to be disclosed here was intended to be included in the agency's exclusion of hospital-specific information from confidential information.

---

**2.** "This section recognizes both the need to protect the interests of patients, health care practitioners and providers of health care in the confidentiality of their medical records and the need to disclose certain information." 50 Fed.Reg. 15,348 (April 17, 1985).

The Secretary argues that the court should not rely upon any regulatory history of the PSRO program in considering the correct interpretation of the regulations, despite the fact that the PRO program and the provisions governing disclosure of information derive from the PSRO program. He argues that because the PRO's focus on "quality" differs so significantly from the PSRO's focus on "utilization" of medical care, PROs now have access to information not available to PSROs. Therefore, he asserts, this additional information was not discussed in the regulatory history, and it is inappropriate to use the PSRO history as an interpretive aid.[3]

While the current PRO program has an increased emphasis on "quality," the PSRO program did not entirely lack a focus on quality. PSROs were established to determine, for purposes of reimbursement under Medicare and Medicaid, whether services were:

> (1) medically necessary; (2) provided in accordance with professional standards; and (3) rendered in the appropriate setting.

Tax Equity & Fiscal Responsibility, P.L. 97–248 (reprinted in USCAAN., 97th Cong., 2d Sess. 817 (1982)). The focus on "quality" is evident in a Senate Report: "[T]he PSRO would be required to ... evaluate the necessity, *quality*, and appropriateness of services...." Senate Comm. on Finance, Social Security Amendments of 1972, S.Rep. No. 1230, 92nd Cong., 2d Sess. 262 (1972) (cited in Second Booth Decl. at 3) (emphasis added).

In other examples, a 1980 memorandum from HCFA to PSROs stated that PSROs "are responsible ... for reviewing the quality of health care services delivered to Federal patients." Booth Decl. Exhibit 5. In discussing a quality review function

known as a "medical care evaluation," the predecessor to "quality review studies," the agency referred to the PSROs' duty to assist hospitals in the "provision of quality care." Booth Decl., Exhibit 6 at 4.

The agency even acknowledged the focus on "quality" in the PSRO program, in the comments to the 1985 final PRO regulations:

> PRO[s] must perform review to determine whether the quality of care provided to Medicare beneficiaries meets professionally recognized standards of health care. Furthermore, this PRO requirement represents the continuation of a peer review function mandated by Medicare statute over the past ten years.... The provisions of section 1154(a)(7)(D) and (a)(9) direct PROs, in a way similar to earlier peer review organizations, to inspect facilities and collect information necessary to carry out PRO review functions, including quality review.... Taken together, these provisions give statutory authority to PROs to conduct quality review in the same manner as conducted by previous Medicare peer review organizations.

50 Fed.Reg. 15,351 (April 17, 1985). It is evident that quality has always been an integral part of the peer review programs, including PSROs, and that "quality review" is not a new concept under the PRO program, as the Secretary contends. While PSROs did not generate the quantity of individualized information that is produced today, there is no reason to believe that PSROs did not have some access to individualized information about quality of care issues that are currently available to PROs.[4] It follows, then, that the PSRO

---

**3.** The Secretary explains that the emphasis of the PSRO program was upon utilization control rather than quality control, and the types of information which evidenced the overutilization of health care services were general or statistical data. Second Booth Decl. at 5. In contrast, the emphasis of the PRO program, investigation of potential quality problems, generates individualized information regarding the treatment of a particular case. *Id.*

**4.** It is true that *more* individualized information regarding the treatment of a particular beneficiary is generated by PROs today than in earlier years of peer review. This does not mean, however, that individualized information was not generated previously. For example, the Peer Review Improvement Act of 1982 authorized reviews of beneficiary complaints, although they were not required.

regulatory history is properly applied to the current PRO regulations.[5]

As further evidence of the intended construction of "institution-specific information," correspondence dated October 24, 1988, from the Director of the Office of Peer Review, commented on 42 C.F.R. Part 476: "Under these regulations, hospital-specific information (e.g., aggregate statistical information) is considered nonconfidential ... and, as such, it can be disclosed." Second Booth Declaration at 11; Exhibit 14 at 1. Listing "aggregate statistical information" as an example of hospital-specific information that is disclosable affirms the narrow interpretation offered by the plaintiff. Also, in the list of *non* confidential information, the agency specifically included "aggregate statistical information," yet did not mention any other type of hospital-specific information. *See* 42 C.F.R. § 476.120(a).

Furthermore, nothing in the agency's response to thirty-nine commenters objecting to the exclusion of information that identifies hospitals from the definition of "confidential information" supports the Secretary's broad interpretation. In a general and imprecise response, the agency noted that "[p]ublic interest is served by providing access to certain PRO data by the public or by agencies that have public responsibilities to which PRO data are relevant," and that disclosure of hospital-specific, but not practitioner-specific, information was supported by recommendations in a study conducted by the Institute of Medicine, Division of Health Care Services in 1981 (IOM Study).

First, the court finds the Secretary's reliance on the IOM Study misplaced. While the IOM Study does advocate disclosure of certain types of information, the information at issue in this case is not one of them. Specifically, the IOM Study recommends that the public should be able to obtain the following:

(1) utilization data about identified institutions in the form of both data tapes and profiles produced by PSROs ...

(2) coded practitioner data ...

(3) unidentified quality review study information, including anonymously displayed performance data about institutions or comparisons among them.

Institute of Medicine, Division of Health Care Services, "Access to Medical Review Data: Disclosure Policy for Professional Standards Review Organizations," National Academy Press, Washington, D.C., Oct. 1981, p. 9 (cited in Appendix, p. 7, Plaintiff's Memorandum in Opposition to Federal Defendant's Motion for Summary Judgment). The language of the IOM Study simply does not contemplate investigatory information regarding specific patients' complaints.[6]

Furthermore, the agency's general response does not support the Secretary's interpretation that all information which identifies hospitals is disclosable. It only refers to "certain PRO data," and illustrates, if anything, that the disclosure of case-specific information, like that at issue in this case, was never discussed or contemplated. The evidence clearly suggests

---

5. The court also notes that the final PRO regulations on disclosure were not promulgated until 1985, long after Congress mandated the heightened emphasis on quality. Yet, after several years in which to modify the regulations to expressly reflect the heightened emphasis on quality and to address the corresponding increase in individualized information in the disclosure regulations, the agency did not do so. Instead, it elected to follow the path of the earlier PSRO regulations. "As the PRO legislation is very similar to the PSRO legislation, we are using the January 1979 proposal as a starting point in issuing these proposed confidentiality regulations for the PRO program." 49 Fed. Reg. 14,977 (April 16, 1984). It is curious that, if the "antiquated" disclosure regulations were

so outdated as to inadequately deal with the new "quality" oriented information generated by PROs, the agency did not formally amend the regulations to keep date.

6. The Secretary argues that the IOM Study is a "reflection of the times," and only refers to the disclosure of statistical information because the focus of the PSRO program in existence at that time (1981) only dealt with that type of information. Federal Defendant's Reply Memorandum at 9. As before, this argument is without merit since the regulatory history clearly shows that the confidentiality provisions currently in existence emanated from the regulations implementing the PSRO program.

that the interpretation the Secretary now advocates (1) is unsupported by any express discussion in the regulatory history and (2) is contrary to what the regulatory history does discuss.

The Secretary acknowledges that since the regulatory history of the PSRO and PRO programs did not expressly debate regulating the disclosure of individualized information PROs would later generate, the practical effect of the disclosure provisions was to only regulate disclosure of the statistical information that was discussed. Federal Defendant's Reply Memorandum in Support of Its Motion For Summary Judgment at 8. Nevertheless, the Secretary argues that all types of hospital-specific information, including information regarding an individual case, are reasonably included among the types of nonconfidential information subject to disclosure under 42 C.F.R. § 476.120.

Because the instant issue was never expressly debated during the initial PSRO rule-making process and had not been debated in the PRO regulatory history before the time this action arose, the Secretary goes far beyond congressional intent in interpreting individualized beneficiary information as nonconfidential and disclosable. As the statutes and regulations indicate, Congress shrouded information acquired by a PRO with a presumption of confidentiality: all information acquired by a PRO "shall be held in confidence and shall not be disclosed," 42 U.S.C. § 1320c-9(a), except where "specifically permitted or required" by the regulations. 42 C.F.R. § 476.103. Therefore, unless the agency specifically addressed the individualized and hospital-specific information at issue here and made it nonconfidential, the congressionally mandated presumption of confidentiality controls. No evidence indicates that the agency addressed this type of information and made it nonconfidential in promulgating the regulations.

Moreover, assuming *arguendo* that the Secretary's interpretation is reasonable and complies with the history and purpose of the regulations, the issue of how the Secretary's interpretation has been applied remains. If not applied consistently, the in-terpretation is not entitled to deference. *Sioux Valley Hosp. v. Bowen,* 792 F.2d at 719. The court finds that the Secretary has not consistently interpreted and applied the regulations to require the extensive disclosure sought in this case—the actual file materials about the PRO's and hospital's discussions and quality review of a specific patient's case.

The Secretary maintains that his agency has consistently interpreted the regulations to require the disclosure of all hospital-specific information and cites examples to support this contention. These examples, however, actually offer support for the hospital's position. The examples indicate that the agency has consistently required to be disclosed to a beneficiary only (a) whether the medical care was deficient and (b) the steps that will be taken to correct any deficiencies. The agency has not required disclosure of the detailed materials underlying the investigation and conclusions.

For example, a 1986 Health Care Financing Administration Regional Medical Review Letter (Region V, Letter No. 86–6) stated that the central office provided that

> "[I]t is important that the PRO not become involved in malpractice suits or be placed in a position to be the patient's advocate in court ... the PRO does not have a responsibility to provide patients with *detailed* information about a case. If the PRO finds problems, it should proceed with its regular channels of resolving identified problems ... However, the PRO should not act as a private investigator, and should not report back to the patient with the *details* of the case."

Second Booth Decl., Exhibit 22 (emphasis added). In a 1987 memorandum to all Executive Directors of PROs, the Secretary stated that

> [I]n the case of a quality problem related to a facility, the PRO would inform the beneficiary that the quality of care did not meet professionally recognized standards and what corrective action will be taken.

Federal Defendant's Reply Memorandum, p. 14; Second Booth Decl., Exhibit 7 at 5.

More recently, the Secretary advised an Associate Regional Administrator that "[t]he PRO would, therefore, for provider information, inform the beneficiary as to whether the care did or did not meet professionally recognized standards and the corrective action to be taken (if applicable)." *Id.*, Exhibit 8 at 2.

In another example, a 1989 memorandum stated that a PRO is required to disclose "(1) its findings with regard to the quality of care provided by the hospital (was it or was it not deficient); and (2) the steps that will be taken to correct any deficiencies." *Id.*, Exhibit 16 at 2. Again, in correspondence dated September 28, 1989, the defendant instructed a PRO to "prepare a letter to [the beneficiary's representative] describing the results of your investigation and corrective action planned." *Id.* at 17, Exhibit 17 at 8. These examples illustrate that the Secretary's interpretation and application of the disclosure regulations have consistently required disclosure, but not to the extent he seeks to require in this case. In the examples cited, only conclusory disclosure of the findings and results of the investigation was required, and not extensive disclosure of all the underlying investigatory materials.

Furthermore, a "model letter" set forth in a proposed addendum to the regulations is indicative of the Secretary's actual disclosure policy. In the model letter, the agency recommends a certain way in which PROs should respond to beneficiary complaints. If the PRO finds the quality of care to be insufficient, the PRO would notify the beneficiary that the

> quality of services you received does not meet professionally recognized standards of health care. We have taken the following steps to correct this situation (list specific corrective actions taken—education, intensified reviews, sanctions).

54 Fed.Reg. 1967 (January 18, 1989). Although the proposed "model letter" was never made final, Patricia Booth, Director of the Office of Peer Review for HHS, stated in her deposition that the proposed model letter would make no substantive change in agency policy regarding disclosure. Booth Deposition, p. 68. Therefore, the disclosure policy contained within the letter—that disclosure must only include the final PRO determination and corrective action taken—and the fact that the model letter would not change existing policy if enacted, are indicative of the Secretary's actual disclosure policy.

The disclosure of findings and results of the investigation rather than extensive disclosure of all the underlying investigatory materials is also consistent with the statutory amendments of 42 U.S.C. § 1320c–3. Previously, PROs were not legally required to conduct reviews of all beneficiary complaints. New legislation enacted in 1986, however, requires PROs to review all written beneficiary complaints about the quality of service. 42 U.S.C. § 1320c–3(a)(14). The statute specifically states that the PRO "shall inform the individual (or representative) of the [PRO's] final disposition of the complaint." *Id.* The regulations elaborate on what the PRO is required to disclose: "A PRO must disclose ... the detailed facts, findings and conclusions supporting the PRO's determination." 42 C.F.R. § 476.139(b)(2). The statute and regulation make no mention of disclosing to the individual any materials other than the investigation's final determination and the facts underlying that conclusion.

The Secretary cites no example in which disclosure as extensive as that sought here was required. In fact, even throughout the evolution of this case, the Secretary's interpretation appears to transform from a position requiring disclosure of the findings and conclusions, to one requiring full disclosure of the information sought.[7]

In conclusion, the court finds that the Secretary's interpretation is inconsistent

---

**7.** During the prolonged correspondence between the beneficiary, Mid–South, Health Care Financing Administration (HCFA), a branch of Department of Health and Human Services (HHS), and the hospital, the defendant's views on disclosure seemed to be continually evolving.

After the beneficiary's daughter contacted Senator Mikulski for help in obtaining the results of the PRO's investigation, and Senator Mikulski contacted HCFA, *see* Exhibit 9, HCFA responded as follows on June 9, 1988:

with the regulatory history, which never expressly discusses the information at issue, but suggests that limited disclosure of hospital-specific information was intended. Also, the Secretary has inconsistently applied the regulations in this case, as he has never required disclosure as extensive as that sought here. Furthermore, as previously stated, Congress protected information gathered and produced by PROs with a presumption of confidentiality, making it non-disclosable unless otherwise expressly made disclosable.

■ For all these reasons, the Secretary's interpretation that the information here is nonconfidential and disclosable is not entitled to deference. Absent any clear statutory language or regulatory history to indicate otherwise, the information at issue is not properly categorized as nonconfidential information, and instead is confidential. Furthermore, the disclosure already made in this case complies with (1) the express statutory and regulatory provisions and (2) the actual disclosure policy of the Secretary, as evidenced by the cited examples.[8] Accordingly, summary judgment is granted for plaintiff,[9] and the court must consider the issue of appropriate relief.

■ Plaintiff's complaint seeks declaratory and injunctive relief. To issue a per-

---

"[S]ection 1154(a)(14) of the Social Security Act ... does not offer to individuals the results of an investigation, but ... does require the PRO to disclose ... the PRO's final disposition of a complaint that it has received about the quality of patient care.... This might include, for example, *a reference to the fact that the complaint had been reviewed and that appropriate steps are being taken to correct the situation* ... The release of facility specific information is disclosable to the patient as long as it does not identify an individual patient, practitioner or reviewer. Therefore, in the case of a quality problem related to a facility, the PRO would inform the [representative] that *the quality of care did not meet professionally recognized standards and what corrective action will be taken.*"
(Thomas Morford, Director of Health Standards and Quality Bureau; emphasis added). This same disclosure policy was affirmed in correspondence on June 13, 1988, *see* Exhibit 11, and July 6, 1988, *see* Exhibit 12 (letter from HCFA to Mid–South). As Mid–South continued to express concern over the proposed disclosure, it requested that HCFA obtain an opinion from HHS' Office of General Counsel assuring Mid–South that the regulations permitted the disclosure. *Exhibit 14. Over a period of several weeks, Mid–South and HCFA debated exactly what the disclosure letter should say. Exhibit 17.*

Finally, a letter which conformed to the above requirements, describing the history of Mid–South's investigation, its findings, and the actions taken by the hospital and Mid–South in response to the findings was provided. Exhibit 18. The representative was not satisfied, however, and demanded a "full report." Exhibit 19. After more discussion between HCFA and Mid–South, HCFA finally directed Mid–South to disclose all the information now at issue. Mid–South was still concerned the disclosure would violate the regulations, and expressed concern that "continued testing of the limits of confidentiality could jeopardize the PRO program." Exhibit 27. It was only after continued pressure

from the beneficiary's representative that HCFA finally decided Mid–South must disclose everything that was requested.

8. On October 6, 1988, a letter describing the history of Mid–South's investigation and its findings, and stating that corrective actions would be taken by the hospital and Mid–South in response to the findings was sent to the party requesting the information. Plaintiff's Exhibit 18. Specifically, Mid–South "concluded that no quality of care problem could be identified" in regard to the care provided to the beneficiary. The investigation did reveal, however, several areas in which the hospital needed to improve its performance, and it is these areas to which the corrective action plan relates. *Id.*

As the enunciated disclosure policies seem to require the PRO to disclose what type of corrective actions the hospital will take or has taken to address the identified problem, the PRO must fully comply with such disclosure policy. *See* Second Booth Declaration, Exhibit 7 at 5 (PRO would inform beneficiary that the quality of care did not meet professionally recognized standards and what corrective action will be taken); *see also* Exhibit 8 at 2; Exhibit 17 at 8; 54 Fed.Reg. 1967 (January 18, 1989) ("list specific corrective actions taken—education, intensified reviews, sanction"). To the extent that the PRO has thus far only disclosed that the hospital took corrective action, but has not specifically disclosed what type of corrective action, the PRO is ordered to disclose that information.

9. The court's decision renders plaintiff's motion to amend moot. The court does agree with plaintiff, however, that one of the claims plaintiff seeks to add provides additional support for the court's decision. Specifically, the court agrees that the proposed disclosure violates Tennessee law governing the confidentiality of medical review materials, Tenn.Code Ann. § 63–6–219. By its express terms, § 63–6–219 plainly affords confidentiality and non-disclosure privilege to information, interviews, re-

manent injunction a court must find that the plaintiff has no adequate remedy at law and will suffer irreparable harm if the court denies equitable relief. *Dayton Christian Schools, Inc. v. Ohio Civil Rights Comm'n*, 766 F.2d 932, 961 (6th Cir.1985), *rev'd on other grounds*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986); *Burrus v. Turnbo*, 743 F.2d 693, 699 (9th Cir.1984). *Buckhorn, Inc. v. Ropak Corp.*, 656 F.Supp. 209 (S.D.Ohio 1987), *aff'd*, 815 F.2d 76 (6th Cir.1987). In other words, "the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Also, courts assess whether injunctive relief would serve the public interest. *Id.; Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 82 (3d Cir.1990); *see also National Organization for Women v. Operation Rescue*, 726 F.Supp. 1483 (E.D.Va.1989), *aff'd*, 914 F.2d 582 (4th Cir. 1990), *cert. granted*, —— U.S. ——, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991).

The court finds that plaintiff satisfies the test for a permanent injunction. First, disclosure by Mid–South of the information at issue could unnecessarily risk damaging the hospital's reputation. Second, hospitals' ability to rely on the disclosure policies as enunciated by the regulations and the Secretary's actions is essential for successful peer review functions.[10] In this case, the hospital's reliance upon the Secretary's disclosure policy, as well as the public interest, necessitates that the internal correspondence and information constituting a PRO investigation of the beneficiary complaint remain confidential.[11]

Accordingly, the court grants a permanent injunction prohibiting Mid–South and the Secretary from disclosing the information at issue in this case. The injunction is narrowly tailored, so that it will remain in effect only as long as the current PRO

ports, statements, data, findings, conclusions and recommendations resulting from peer review proceedings. To the extent that the Tennessee confidentiality provisions are consistent with federal law, they are not preempted and provide additional support for the plaintiff's position.

Also, it is not necessary for the court to consider the quality review study issue.

**10.** The court will not undertake a detailed explanation of the importance of confidentiality to the peer review program. A sample of explanations regarding confidentiality will suffice. On one occasion the medical director of Mid–South contacted HCFA's Office of Peer Review (Richard Husk) and the HCFA Administrator (Dr. Roper) to state his concerns about the proposed disclosure. File memoranda on these calls note that "continued testing of the limits of confidentiality could jeopardize the PRO program." Exhibit 27.

Wayne Heatherly, Administrator of the hospital, explains that to have an effective peer review system, the trust and support of the hospital is essential, Exhibit 40, p. 3, and in this situation, the parties have created an "atmosphere conducive to successful quality assurance and peer review activities." *Id.* The hospital has an "open flow of communication with the PRO, and the result has been beneficial for all concerned, most importantly, the patients.... The key to the success of ... its relationship with the PRO has been confidentiality.... Only by diligently protecting this confi-

dentiality in the face of efforts by third parties to obtain quality assurance information will we be able to continue our strong quality assurance program." *Id.* at 4.

"If the PRO is allowed to disclose the information it intends to disclose in this case, the Hospital's ability to cooperate freely with the PRO will be significantly chilled. The Hospital and the PRO will become adversaries ... the positive, self-critical, approach which is possible when there is full and free communication and confidentiality will be lost ... and the benefits which can be gained from peer review will disappear." *Id.* at 5.

**11.** The Secretary maintains that requiring him to draft an exclusive list of nonconfidential information would "represent a failure to recognize that regulations concerning the review of medical care could become obsolete as quickly as does medical care itself." Thus, it seems the Secretary is arguing that, in order to battle "obsolete" regulations, his agency should have the unlimited ability to designate information as nonconfidential without going through the appropriate rulemaking procedures established by law. This argument must be rejected. Congress granted the Secretary authority to make certain PRO information disclosable, but only as designated "by regulation." 42 U.S.C. § 1320c–9. Congress did not confer the Secretary with the authority to unilaterally change published disclosure regulations and circumvent established rule-making procedures, by enforcing internal interpretations contrary to the language and history of the regulations.

disclosure regulations are applicable. If the Secretary chooses to amend the regulations to permit such disclosure at some time in the future, then the injunction will terminate at that time.

IT IS SO ORDERED.