PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 08-1982

_____

ANTHONY SIDES,
                                        Appellant

v.

OFFICER CHERRY; OFFICER BROWN;
OFFICER RUSH; OFFICER JULIANI
sued in their Individual Capacity; PHYSICIAN ASSISTANT
LAPINA, sued in her Individual and Official Capacity

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 2-03-cv-00494)
District Judge: Honorable Gary L. Lancaster

_____

Argued November 10, 2009

Before: AMBRO, GARTH, and ROTH, <u>Circuit Judges</u>

(Opinion filed: June 22, 2010)

Thomas L. Kirsch II, Esquire (Argued)
Kristin Palmer, Esquire
Brandon Swider, Esquire
35 West Wacker Drive
Chicago, IL 60601-9703

      Counsel for Appellant

Kemal A. Mericli (Argued)
   Senior Deputy Attorney General
Appellate Litigation Section
Office of Attorney General of Pennsylvania
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219

      Counsel for Appellees

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Anthony Sides brought this suit under 42 U.S.C. § 1983 against various prison officials at SCI Greene, a correctional facility in Pennsylvania, alleging violations of his Eighth and Fourteenth Amendment rights. The case proceeded to trial in

the United States District Court for the Western District of Pennsylvania, where the jury reached a verdict in favor of the defendants. Sides appeals that decision, contending that he was denied a fair trial because the District Court required that he be restrained by handcuffs and leg irons throughout the trial. Though we have concerns regarding the manner in which the Court handled this issue, any error here was nonetheless harmless. Thus we affirm.[1]

I.      Background

In his Complaint, Sides, a former inmate at SCI Greene, alleged that Officer James Cherry entered his cell and attacked him in April 2002. Sides further alleged that other prison officials denied his repeated requests for medical care. The case proceeded to trial in January 2008.

        A.      The District Court's Imposition of Physical
                Restraints

Following jury selection, the District Court held an informal conference in chambers and raised the possibility that Sides would be physically restrained—*i.e.*, appear in leg irons and handcuffs—during trial. Sides' counsel objected to the imposition of any physical restraints, and argued—citing

[1] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

3

precedent from another circuit court—that the District Court should employ a "balancing test" to determine whether physical restraints were warranted "in terms of [the] interest of the plaintiff and the need[] to have him in handcuffs." Counsel also urged the Court not "just . . . [to] defer to any type of Department of Corrections policies" on the issue.

In response, defendants' counsel noted that he did not represent the Department of Corrections, and thus could not "really give . . . guidance" to the Court on the issue. When the Judge asked whether counsel would "make some calls to see if somebody could come up and represent" the Department of Corrections, counsel responded that Sides was considered "very high risk," had "been a very assaultive inmate[,] and [was] currently in a special needs unit" at SCI Greene. Though defendants' counsel stated that he would be willing to "proffer testimony" on the issue, he argued that, in light of "Sides' track record of . . . misconduct[] and violence," it would be appropriate to have him "handcuffed and shackled and certainly [placed] under guard."

The Judge then informed the parties that he had spoken with a United States Deputy Marshal that morning regarding the issue:

> I was told by [the] Deputy Marshal . . . [,] who is
> in charge of security for the Courts, that Mr. Sides
> is a category five security risk[,] which is the

4

highest category of security risk the Department of Justice has or Department of Corrections has. That he is in a special needs unit at the prison. That if ordered, I could have the shackles removed; however, he recommended against it.

I asked him what could be done to minimize this and he ha[s] agreed to place some type of a curtain at the desk so that the shackles would not be obvious throughout the trial.

We've agreed that when he is called to testify, we will take him—we'll take the jury out of the room, put him in the witness box. I mean, the guards will take the shackles off. The marshal will put extra people in the courtroom while he testifies.

Accepting the Court's ruling, Sides' counsel raised the additional concern that, if corrections officers sat directly behind Sides during trial, "anything he want[ed] to discuss with [counsel] ha[d] the potential of being heard by" the officers. The Court acknowledged that "this is an obvious prejudicial issue," but "suggest[ed] [that they] whisper."

The District Judge put in place preventive measures during trial to mitigate the prejudice to Sides of appearing in shackles. Those measures were: a jacket be placed over Sides'

5

hands and wrists to hide the handcuffs while he sat at the plaintiff's table; a paper apron be wrapped around the plaintiff's table to obscure Sides' leg irons; and Sides would not testify wearing either the handcuffs or leg irons. Because the apron did not reach the bottom of the floor, boxes were placed underneath the table to obscure completely the leg irons (though no similar measures were taken with respect to the defendants' table). In addition, the Judge addressed the fact that Sides would be physically restrained during trial in his preliminary instructions to the jury.

B.    The Trial

Despite the measures the Judge called for, Sides' handcuffs were not always obscured. When Sides stood up as the Judge entered or left the courtroom, the jacket shifted off his hands, exposing the handcuffs. The jacket also shifted off Sides' hands whenever he raised them to write a note to his lawyer or take a drink of water. On each such occasion, Sides' trial counsel readjusted the jacket to conceal the handcuffs. In addition, two uniformed correctional officers sat approximately five feet directly behind Sides throughout the trial.

Before Sides took the witness stand to testify, the jury was taken out of the courtroom. Contrary to the District Court's order, however, Sides—for reasons not apparent from the record, and despite the reminder of Sides' counsel to the Court of its prior instruction (Trial Tr. 4–5, Jan. 29, 2008)—testified

6

while wearing handcuffs and leg irons. When he motioned with his hands during his testimony, the jacket covering his handcuffs shifted and the handcuffs became visible.

Sides testified as follows. He and Officer Cherry got into an argument on the morning of April 20, 2002. Cherry became increasingly agitated, and ultimately instructed Officer Brown to unlock Sides' cell. Cherry entered Sides' cell and began striking Sides with his fists. Immediately after the attack, Sides requested medical attention from Officers Rush and Brown, who denied his requests. According to Sides, Officer Juliani also denied medical attention to Sides when he requested it later that day. Sides claimed he did not receive medical attention until nearly a month later, when a prison physician's assistant examined him. He testified as well that he still suffers neck pain from the attack.

The officers also testified at trial. Officer Cherry stated that Sides was agitated and threatening the morning of April 20, but denied he had entered Sides' cell or attacked him. Officers Rush, Brown, and Juliani also disavowed any knowledge of the incident, and denied that Sides had ever requested medical treatment.

The jury returned a verdict in favor of the defendants. Sides filed a motion for a new trial, which the District Court summarily denied. He timely appeals to us.

II.    Discussion

A.    Physical Restraints and the Right to a Fair Trial

In *Illinois v. Allen*, 397 U.S. 337 (1970), the Supreme Court recognized that requiring a criminal defendant to appear in shackles before a jury may result in an unfair trial. As the *Allen* Court explained, "[n]ot only is it possible that the sight of shackles . . . might have a significant effect on the jury's feelings about the defendant, but the use of th[e] technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.* at 344. Because shackling a defendant during trial is an "inherently prejudicial practice," it "should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986); *see also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that the appearance of a criminal defendant in shackles "almost inevitably affects adversely the jury's perception of the character of the defendant").

Several of our sister circuit courts have reasoned that the concerns expressed in *Allen* also apply in the context of civil trials. *See Davidson v. Riley*, 44 F.3d 1118, 1122 (2d Cir. 1995) ("[T]he concerns expressed in *Allen* are applicable to parties in civil suits as well."); *Woods v. Thieret*, 5 F.3d 244, 246 (7th Cir. 1993) ("[T]he principles from *Allen* . . . extend[] to include not just criminal defendants, but inmates bringing civil actions and

inmate-witnesses as well."); *Holloway v. Alexander*, 957 F.2d 529, 530 (8th Cir. 1992) ("In [prisoner civil rights] cases, the district court has a responsibility to ensure reasonable efforts are made to permit the inmate and the inmate's witnesses to appear without shackles during proceedings before the jury."); *Tyars v. Finner*, 709 F.2d 1274, 1284–85 (9th Cir. 1983) (discussing *Allen* and reasoning that "[t]he likelihood of prejudice inherent in exhibiting the subject of a civil commitment hearing to the jury while bound in physical restraints . . . is simply too great to be countenanced without at least some prior showing of necessity").

We agree with these courts, as "fairness in a jury trial, whether criminal or civil in nature, is a vital constitutional right." *Bailey v. Sys. Innovation, Inc.*, 852 F.2d 93, 98 (3d Cir. 1988); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment."). Thus, we join them, and hold that requiring a party in a civil trial to appear in shackles "may well deprive him of due process unless the restraints are necessary." *Davidson*, 44 F.3d at 1122. We reject the officers' argument that, because prisoner-plaintiffs have no absolute constitutional right to be present during a civil trial, they necessarily do not have a right to appear at such a trial without physical restraints. *See Lemons v. Skidmore*, 985 F.2d 354, 358 n.3 (7th Cir. 1993).

B.    Abuse of Discretion

9

We also follow our sister circuits in reviewing for abuse of discretion a district court's decision to restrain an inmate physically during a civil trial.[2] *See Davidson*, 44 F.3d at 1124; *Lemons*, 985 F.2d at 358. "The principles consistently applied are that the trial court has discretion to order physical restraints on a party or witness when the court has found those restraints to be necessary to maintain safety or security[.]" *Davidson*, 44 F.3d at 1122–23. Thus, district courts should balance the prejudice to the prisoner-plaintiff against the need to maintain safety or security. *Woods*, 5 F.3d at 247; *see also Davidson*, 44 F.3d at 1125 (district courts have a "responsibility to determine whether [a prisoner-plaintiff's] due process right not to appear before the jury in shackles . . . [is] outweighed by considerations of security"). When a district court determines that restraints are necessary, it should "impose no greater restraints than are necessary, and [] must take steps to minimize the prejudice resulting from the presence of the restraints." *Davidson*, 44 F.3d at 1123; *see also Holloway*, 957 F.2d at 530 (when physical restraints are necessary, a district court "should take appropriate

---

[2] We deal in this case solely with the decision to shackle a prisoner-plaintiff in a *civil* trial. Though we believe the procedures we adopt are generally consistent with those applicable in the criminal context, the decision to shackle a criminal defendant during trial involves even weightier due process concerns, and a well-developed body of precedent applies in that context. *See, e.g.*, *United States v. Baker*, 432 F.3d 1189, 1241–46 (3d Cir. 2005).

10

action to minimize the use of shackles, to cover shackles from the jury's view, and to mitigate any potential prejudice through cautionary instructions").

What process should trial courts use to seek the proper balancing of interests?  At the least, they should hold a proceeding outside the presence of the jury to address the issue with counsel.  However, where there are genuine and material factual disputes regarding the threat to courtroom security posed by a prisoner-plaintiff, an evidentiary hearing is called for.[3]  *See Davidson*, 44 F.3d at 1125 (district court abused its discretion in refusing to hold an evidentiary hearing as to disputed allegations that the prisoner-plaintiff was a flight risk); *see also Lemons*, 985 F.2d at 358.

In determining whether an inmate should be physically restrained during trial, district courts may rely on a variety of sources, including (but not limited to) records bearing on the inmate's "proclivity toward disruptive and/or violent conduct" (such as the inmate's criminal history and prison disciplinary

---

[3] We stress that an evidentiary hearing is necessary only where *genuine* and *material* factual disputes exist as to the danger posed by a prisoner-plaintiff.  We caution, however, that an evidentiary hearing on the shackling question is not an appropriate forum in which to re-litigate the events underlying a prisoner-plaintiff's prior convictions or disciplinary infractions while in prison.

11

record), and the opinions of "correctional and/or law enforcement officers and the federal marshals." *Woods*, 5 F.3d at 248. Indeed, though a district court may rely "heavily" on advice from court security officers, it "bears the ultimate responsibility" of determining what restraints are necessary, and "may not delegate the decision to shackle an inmate to the marshals." *Id.*; *see also Hameed v. Mann*, 57 F.3d 217, 222 (2d Cir. 1995) (same). Thus, when a trial court delegates the shackling decision to court security officers, "that is not an exercise of discretion but an absence of and an abuse of discretion." *Lemons*, 985 F.2d at 358.

Sides contends that the District Court impermissibly delegated to the Deputy Marshal its authority to determine whether (and what) physical restraints were necessary, and thus necessarily abused its discretion. We disagree. Though the Court adopted the Deputy Marshal's advice, it nonetheless acknowledged that the Marshal's view was only a recommendation and that the Court "could have the shackles removed." *See Hameed*, 57 F.3d at 223 ("Though the court plainly indicated that it relied heavily on the expertise of the prison personnel, it also indicated that the ultimate decision was that of the court."). Accordingly, this case is not similar to those where a district court has no doubt delegated the shackling decision to security personnel. *See Davidson*, 44 F.3d at 1125 (district court stated that the decision on physical restraints was "up to the officers" who accompanied the plaintiff, and that it would not "do anything different than [what] they advise");

12

*Lemons*, 985 F.2d at 358 (district court left the decision on physical restraints "entirely in the hands of the Department of Corrections").

That said, it appears from the record we have that the District Judge's inquiry into the need for physical restraints was limited to an *ex parte* communication with the Deputy Marshal. We do not know, for example, whether the Deputy Marshal disclosed to the Judge the basis for Sides' designation as a "category five security risk," his placement in a "special needs unit," or the meaning of those classifications. It is also unclear—apart from the assertions of defendants' counsel that Sides had been a "very assaultive inmate" and had a "track record of . . . misconduct[] and violence"—whether the Judge inquired as to the particulars of Sides' criminal history or prison disciplinary record, and whether that history further suggested that Sides posed a safety risk during court proceedings. *Cf. Woods*, 5 F.3d at 249 (magistrate judge did not abuse his discretion by ordering inmates shackled during a civil trial where the inmates "were undeniably dangerous as evidenced from their criminal records[,] which include[d] two murders, numerous armed robberies, rape and aggravated assault"). To the extent the District Judge chose to defer to the Deputy Marshal's recommendation, we believe he should have received it on the record, thus allowing Sides an opportunity to challenge the rationale for that recommendation. *See Hameed*, 57 F.3d at 223 (district court abused its discretion by, *inter alia*, relying on *ex parte* communications from unidentified corrections officials

13

in determining that shackles were necessary).

It is also unclear on this record whether the District Judge simply accepted the Deputy Marshal's recommendation without, as Sides urged, balancing the need for physical restraints against the potential prejudice to him in determining whether, and to what extent, physical restraints were required. The Judge plainly was concerned by the prejudicial effect of shackling Sides during trial, and took measures to ameliorate that prejudice. However, he did not explain his reasons for determining that the measures recommended by the Deputy Marshal—handcuffs, leg irons, and having corrections officers sit directly behind Sides throughout the trial—were "no greater . . . than . . . necessary" to secure the courtroom. *Davidson*, 44 F.3d at 1123; *see also Woods*, 5 F.3d at 248 (trial judge approved the use of restraints for numerous reasons, including: "(1) the poor design of the courtroom[,] [which] required inmate-witnesses to travel through the courtroom in close proximity to the bench, counsel tables and jury box to reach the stand[;] (2) the number of inmate-witnesses (five) entering and exiting the courtroom[;] [and] (3) the presence of only one court security officer in the court"); *Lemons*, 985 F.2d at 358 n.4 ("'Unless the district [court's] discretion is to be absolute and beyond review, the reasons for its exercise must be disclosed in order that a reviewing court may determine if there was an abuse of discretion.'") (*quoting United States v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970)). On this record, we are unsure whether the Court balanced the relevant interests before deciding that Sides

14

would be restrained, or considered whether the security measures recommended by the Deputy Marshal were collectively necessary (but not sufficient individually) to secure the courtroom. *Cf. Lemons*, 985 F.2d at 359 ("[A] determination that some restraints are appropriate does not mean that leg-irons and handcuffs are required.").

For example, it appears that even the Deputy Marshal did not believe Sides posed such a security risk that it was necessary he be restrained in handcuffs and leg irons at all times. Indeed, both the Deputy Marshal and the District Court agreed that it was unnecessary for Sides to be shackled when he testified from the witness stand, where he (presumably) was in far closer proximity to the jury and the Judge than while seated at the plaintiff's table.

Moreover, we are troubled that Sides testified while wearing handcuffs and leg irons, despite the reminder of Sides' counsel (shortly before Sides testified) to the Court of its prior direction to dispense with shackling during his testimony. In that light, we stress that where a district court has found certain preventive measures advisable to reduce the prejudice to a prisoner-plaintiff who is restrained during trial, it should make every effort to ensure that those measures are actually (and consistently) applied.

C.    Harmless Error

15

We need not determine whether the District Court abused its discretion here, however, as we conclude that any error was harmless. *See, e.g.*, *Davidson,* 44 F.3d at 1124; *Lemons*, 985 F.2d at 359. Several factors are relevant to this analysis, including (1) "the strength of the case in favor of the prevailing party," *Hameed*, 57 F.3d at 222; (2) the "effect the restraints may have had in light of the nature of the issues and the evidence involved in the trial," *id.*; *see also Davidson*, 44 F.3d at 1124–25 ("Where the restraints would appear to be pertinent to the substance of the plaintiff's claims, the error may well not be harmless."); (3) whether measures were taken to prevent the jury from viewing the restraints, *Woods*, 5 F.3d at 249; and (4) whether the district court instructed the jury to disregard the restraints in deciding the case, *id.*

The officers argue that any error was harmless because (1) Sides' propensity for violence was not at issue, *cf. Lemons*, 985 F.2d at 357 ("Since plaintiff's tendency towards violence was at issue in this case, shackles inevitably prejudiced the jury."); and (2) the Court took preventive measures to conceal the shackles.

First, we cannot agree that Sides' shackling was harmless simply because his propensity for violence was not directly at issue in the case. In this regard, we find instructive the Court of Appeals for the Second Circuit's decision in *Davidson*, which involved an inmate's § 1983 action against various prison officials for violating his right of access to the courts by reading

16

his legal mail. 44 F.3d at 1119. In holding against harmless error, the Second Circuit Court reasoned that though the plaintiff's claim did not "b[ear] a relationship to either a propensity toward violence or a risk of escape, the potential for prejudice nonetheless seem[ed] to have been significant, for the verdict apparently was to turn on whether the jury would believe [the plaintiff] and his prisoner-witnesses or the [Department of Corrections'] witnesses." *Id.* at 1126 (appearing in shackles was prejudicial to prisoner-plaintiff because the case came down to a "'swearing contest' in which the credibility of the witnesses was 'crucial'"). Similarly, the core issue in Sides' case was credibility—whether the jury would believe Sides or the officers, who denied that the incident alleged by Sides had even taken place. In this context, we are unwilling to say that the imposition of physical restraints cannot result in prejudice simply because the plaintiff's propensity for violence is not at issue.

Yet the District Court took several appropriate steps to conceal the shackles from the jury, including directing that (1) a jacket be placed over Sides' hands, (2) an apron and boxes be placed around the plaintiff's table, and (3) the jury be removed from the courtroom before Sides took the witness stand (so as to avoid jurors viewing Sides walk to the stand in leg irons). As Sides points out, these measures often were not effective—*e.g.*, in some instances the jacket over his hands shifted, revealing his handcuffs to anyone who was looking at him at that moment. However, that these measures did not always conceal Sides'

17

shackles throughout trial does not compel the conclusion that he was prejudiced. Moreover, the limited instances where Sides' shackles may have been exposed to the jury are dissimilar to the more prejudicial circumstances of the cases on which he relies. *See Davidson*, 44 F.3d at 1126 (prisoner-plaintiff appeared *pro se* at trial, but the trial court "declined to modify its usual voir dire procedure though that procedure forced [the plaintiff] to hobble in leg-irons from [the] counsel table to the bench after each round of questioning before he could make any objection to any prospective juror"); *Lemons*, 985 F.2d at 356, 359 (prisoner plaintiff appeared in handcuffs and leg irons during trial—including when he testified and "walk[ed before the jury] to demonstrate his injuries"—but no "ameliorative steps were taken" by the trial court).

In addition, the District Court—apparently without prompting by Sides' counsel—gave a cautionary instruction to the jury at the beginning of trial:

> The Constitution does not stop at the prison walls. All prisoners, including Mr. Sides, are afforded the same protections under the United States Constitution as you and I.
>
> However, according to standard policy of the Department of Corrections, Mr. Sides will be secured while in the courtroom and accompanied by uniformed officers here in the courtroom.

18

Again, this is a . . . standard procedure[] for all inmates, and is not innate to Mr. Sides. Such procedures are always employed when any inmate comes into the courtroom. While these circumstances are hard to ignore, you must keep in mind that this is not something special, no special thing we are doing for Mr. Sides. It is simply the standard procedure.

Also, during the course of the trial, other inmates may testify. These inmates will also be secured and accompanied by uniformed officers. Again, you are not to allow these standard security measures to distract you from your job. That is to decide the case based . . . solely on the evidence.

We believe this instruction cured any prejudice to Sides.[4] Not only did the Court direct the jury to disregard the restraints and decide the case "based . . . solely on the evidence," it sought to dispel any assumption on the jury's part that Sides was restrained because he was a dangerous person (by instructing that the restraints were "standard policy" for all inmates). In

_____

[4] The parties did not address the District Court's preliminary instructions in their briefs to us, and did not include those instructions as part of the record on appeal. We subsequently asked the parties to supplement the record to include them.

19

light of this cautionary instruction, we conclude that the instances where Sides' shackles were exposed—*i.e.*, when he moved his hands while sitting at the plaintiff's table, and when he testified—were not so prejudicial as to warrant a new trial. *See Woods*, 5 F.3d at 249 ("taking steps to reduce the visibility of restraints and the giving of limiting or curative instructions dealing with the shackles are appropriate methods of eliminating potential prejudice"); *Holloway*, 957 F.2d at 530 ("Any general prejudice caused by the presence of the shackles was cured when the district court admonished the jury to disregard the shackles in their consideration of [the prisoner-plaintiff's] case.").

\* \* \* \* \*

In closing, we stress (as other circuit courts have) that we "do[] not endorse a general policy of parading inmate civil plaintiffs or their witnesses before the jury in shackles." *Holloway*, 957 F.2d at 530. We recognize, however, that district courts have the weighty responsibility of ensuring the security of their courtrooms, and endorse their broad discretion in determining whether it is necessary to have a prisoner-party or witness physically restrained during a civil trial. So long as a district court engages in an appropriate inquiry and supplies a reasonable basis for its decision, we will defer to its determination that physical restraints are necessary to ensure courtroom security, as the trial judge is uniquely positioned and qualified to make that determination.

20

In summary, before ordering a prisoner-party or witness shackled at trial, district courts should hold a proceeding that allows the parties to offer argument bearing on the need for restraints as well as the extent of the restraints deemed necessary (if any). Where genuine and material factual disputes bearing on these questions exist, courts need to conduct an evidentiary hearing to resolve them. They should weigh the need for restraints against the potential for prejudice, and impose no greater restraints than necessary to secure the courtroom. Finally, courts should take all practical measures, including a cautionary instruction, to minimize the prejudice resulting from a party appearing in physical restraints.

In this case, we conclude that, even if the District Court erred in ordering that Sides be shackled during trial, that error was harmless. Accordingly, we affirm.[5]

---

[5] In addition to his challenge to the physical restraints imposed during trial, Sides contends that the District Court abused its discretion by denying his motion to compel the production of a Department of Corrections procedures manual without first reviewing the manual *in camera*. However, as Sides acknowledges, he did not request that the Court review the manual *in camera*. In any event, we conclude that the Court did not abuse its discretion in denying the motion to compel in light of security concerns and instead ruling that neither side would be permitted to refer to the manual during trial. *See Armstrong v. Dwyer*, 155 F.3d 211, 214 (3d Cir. 1998).